IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2018 Session

**STATE OF TENNESSEE v. MISSY DANIELLA LANE**

**Appeal from the Circuit Court for Cocke County**
**No. 5824      Ben W. Hooper, II, Judge**

———————————————————

**No. E2017-01907-CCA-R3-CD**

———————————————————

A Cocke County Jury found Defendant, Missy Daniella Lane, guilty of reckless homicide. The trial court imposed a sentence of two years to be served in confinement. On appeal, Defendant raises the following issues: (1) whether the evidence was sufficient to support her conviction for reckless homicide; (2) whether the trial court erred by denying Defendant's motion for an extension of time to file an amended motion for new trial; (3) whether the Cocke County Grand Jury had jurisdiction to render a superseding presentment; (4) whether the trial court denied Defendant the right to peremptory challenges during voir dire; (5) whether Defendant was prejudiced by a violation of the rule of sequestration by the State's witnesses; (6) whether the State committed prosecutorial misconduct by calling Derrick Raines as a witness; (7) whether the trial court violated Defendant's right to a public trial; (8) whether the State's expert witnesses testified improperly; (9) whether the trial court improperly denied Defendant's request for  jury instructions; (10) whether the jury was exposed to extraneous information; (11) whether the State committed prosecutorial misconduct during closing arguments; (12) whether the trial court properly denied alternative sentencing; and (13) cumulative error. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and NORMA MCGEE OGLE, JJ., joined.

Herbert S. Moncier and Houston Havasy, Knoxville, Tennessee, for the appellant, Missy Daniella Lane.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; James B. Dunn, District Attorney General; and Joanne Sheldon and

Tonya Thornton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

On October 29, 2013, Janice Faye Gorrell had pulled over at the "Old Layman's Market" on Carson Springs Road because her grandson was crying. She saw what "looked like a man working on a truck[.]" Ms. Gorrell turned around between the seats to tend to her grandson, and when she turned back around she saw Defendant with blood all over her hands. Defendant "was holding her phone and she was saying, 'Please help me.' And she was like my - - she said 'my husband.' She said, 'He's been shot.'" Ms. Gorrell took Defendant's phone, but no one was on the line. Ms. Gorrell used her cell phone to dial 9-1-1. She then realized that the man "wasn't working on a truck." Ms. Gorrell flagged down a woman in a black car who got out of the car and ran over to Defendant and the man, later identified as the victim. Ms. Gorrell noted that Defendant's phone, a black flip-phone, was not working.

Ms. Gorrell agreed that during the 9-1-1 call she said that the victim shot himself. When asked if Defendant said that she shot the victim, Ms. Gorrell testified:

> I cannot say that the defendant told me that she shot him. I believe it was the lady that I stopped. She - - because, I mean, I was frantic. I'm not going to lie about it. And because I didn't even know the lady's name. I don't remember a whole lot of anything, but I remember, you know, she saying her husband was shot. And I am not a person that is a negative person. I assumed that he had shot himself. I don't know anybody in their right mind that would, you know, shoot somebody, and so that's what I had assumed and I was - - she was wanting help and I was trying to help her.

Ms. Gorrell testified that Defendant never told her that the victim shot himself. In a later statement to police, she said that the other lady who came to the scene told her that Defendant "said that she was handing the gun to her husband and it went off[.]"

Katie Nease is an LPN at Newport Health and Rehabilitation. On October 29, 2013, she was driving on Carson Springs Road to a friend's house when "[a] lady ran out in front of me covered in blood." Ms. Nease testified that the woman had blood on her hands and clothing, and she was hysterical. Ms. Nease said that she "jumped out of the car and run over to check on the guy, that was laying on the ground." Defendant was screaming to Ms. Nease that the man, the victim, had "shot his self [sic]." Ms. Nease saw the victim lying on the ground on his back in front of a truck. He had a gunshot wound.

She checked the victim's pulse, and he did not have one. She also saw a cell phone and a gun lying near the victim's body. Ms. Nease noted that there was another woman on the scene with a child, and she was on the phone with 9-1-1.

Ms. Nease testified that she asked Defendant what happened. Ms. Nease testified:

> I did ask the lady that was there. I asked her what had happened and she told me that they had a gun that the grandfather had left and they was going to go to the pawn shop to get it appraised, that they were needing money and they were going to clean it and he was going to shoot it to make sure that it still shot and he accidentally shot himself.

Ms. Nease asked Defendant if the shooting was "done on purpose," and she said no. She said that Defendant had blood on her hands, and she put her hands on the victim while Ms. Nease was there, and Defendant "got down over top of him, [ ], laid on him." Ms. Nease testified that the ambulance arrived within three to four minutes. She did not see anyone else on the scene.

On cross-examination, Ms. Nease agreed that Ms. Gorrell was out on the highway waiving for her to stop. She also agreed that the scene was chaotic and confusing. She heard Ms. Gorrell talking to 9-1-1, but she was not sure what Ms. Gorrell said. Ms. Nease then saw Defendant who was covered in blood and hysterical. When asked if she told Ms. Gorrell that Defendant was handing the gun to the victim when it accidently discharged, Ms. Nease testified:

> The story that I got was they - - like I said, they had a gun that the grandfather had left and they had - - going to take it to the pawn shop, get it appraised because they needed money. He was going to clean it. They were going to shoot it to make sure it still shot and he had accidently shot his self.

Lorenzo Lozano is employed by First Call Ambulance Service as an Advanced Emergency Technician. He was called to the scene on October 29, 2013, concerning a gunshot victim. He did not go inside the area until police cleared the scene. He noted that there was a hysterical female on the scene prior to his arrival. Mr. Lozano testified that he saw the victim on the ground. The victim had a gunshot wound to his chest, and he had no pulse nor was he breathing. Mr. Lorenzo thought that the gunshot went into the victim's chest and out of his back. He noticed a gun next to the victim's body. Mr. Lorenzo testified that the female at the scene was hysterical the entire time that they were there.

Pam Martin is also employed by First Call Ambulance Service as a Critical Care Paramedic and was dispatched to the scene on October 29, 2013. She found the victim

lying on the ground in front of a vehicle. She noted that there was a significant amount of blood on the ground. Ms. Martin saw a gun lying on the ground beside the victim, and she remembered a lady who "was very upset, anxious, was screaming, and at that point, my supervisor and her partner were both medics had already arrived and pretty much took over that part of it taking care of her and finding out what was going on." Ms. Martin checked the victim and declared him "dead upon arrival." She remembered speaking to "the lady that told me that they were going to pawn a gun, she was handing the gun, and it accidently went off." Ms. Martin could not recall how many people were on the scene.

Lieutenant Ricky Holt of the Cocke County Sheriff's Department testified that he was the first officer to arrive on the scene on October 29, 2013. He saw the victim lying on the ground and a lady was there with him. He said that Defendant was sitting in a chair, and he saw a gun near the porch. He did not know Defendant or the victim. Lieutenant Holt secured the scene and flagged the ambulance to come in. He did not speak with Defendant or recall her clothing. He thought that Defendant was crying, but she did not seem hysterical.

Deputy Jerry Vandergriff formerly of the Cocke County Sheriff's Department arrived on the scene after Lieutenant Holt. He saw two other women at the scene, one of whom was Janice Gorrell. He did not speak with the women or Defendant. Deputy Vandergriff made sure that the scene was safe, and he called investigators. He said that the victim was lying face up, and he noticed a gun lying next to the victim's body.

On cross-examination, Deputy Vandergriff testified that there were two other ladies with Defendant who arrived much later. He said that Defendant was visibly distraught at times and that she "would go from hysterical to calm to hysterical to calm from what I seen."

Captain Derrick Woods of the Cocke County Sheriff's Department testified that Lieutenant Holt notified him of the shooting, and he arrived on the scene at approximately 1:30 p.m. He thought that some of Defendant's family arrived some time later. Captain Woods took photographs of the scene and of Defendant. She had blood on both hands and on her shirt. Captain Woods was present when the victim's body was turned over, and there was a flip phone under the victim's body with blood on it. The phone was open. Captain Woods photographed the revolver found at the scene. He noted that it was a five-shot revolver with four rounds left in it. One round had been fired from the weapon.

Captain Woods testified that he eventually spoke with Defendant and advised her of her *Miranda* rights, and she signed a waiver of those rights. He made a video of the demonstration that Defendant gave to the Sheriff concerning where the victim was standing, where Defendant was standing, and how she was holding the gun.

- 4 -

On cross-examination, Captain Woods testified that Defendant was upset at times and, "at times she wasn't." He said that two of Defendant's aunts, Phyllis Bryant and Alfreda Huff, arrived on the scene. Captain Woods testified that the cell phone was under the victim's back in close proximity to the bullet hole. It appeared that blood dripped on the phone from the wound. Captain Woods noted that Defendant had blood on both knees, her left sleeve, her face, and her hands.

Sheriff Armando Fontes testified that he arrived on the scene and spoke with Defendant. She was advised of her *Miranda* rights, and his interview with her was video recorded by Captain Woods. Defendant told Sheriff Fontes that she shot the victim in the back and that it was an accident. On cross-examination, Sheriff Fontes agreed that Defendant seemed to be upset. According to his notes taken at the scene, Defendant told him that the victim was in front of her, "he reached back to get the gun, she went to hand the gun and it went off[.]" Sheriff Fontes did not recall seeing a pink jacket at the scene that was seen in the video of his interview with Defendant.

Detective Jason Oury of the Cocke County Sheriff's Office testified that he examined the victim's body and located items of evidence. He also bagged the victim's hands to preserve evidence and spoke with other officers on the scene to learn what happened. Detective Oury recovered a .38 Special Rossi revolver handgun that was lying on the ground a short distance away from the victim. He and Detective Webb rolled the victim's body over, and they found a cell phone located underneath the victim's body.

Detective Oury transported Defendant to the sheriff's department for a formal interview. Defendant changed out of the clothing that she had been wearing at the time of the shooting and into something else, and Detective Oury sealed the garments in a bag. Detective Oury noted that Defendant's pants and shirt appeared to have blood on them. He later retrieved all of the victim's personal effects from the Regional Forensic Center. The victim's clothing and the revolver were taken to the Tennessee Bureau of Investigation (TBI) Crime Laboratory in Nashville.

Detective Oury testified that he advised Defendant of her *Miranda* rights before he interviewed her at the Sheriff's Department. Defendant waived her rights, and Detective Oury made a recording of the interview.

Detective Oury testified that Defendant "was upset, would calm down, get upset again, calm down." He told Defendant during the interview that she was not in any trouble. Detective Oury testified that at the time, there was not a determination that a homicide had occurred. He testified that Defendant demonstrated how she was holding the weapon when it fired. She indicated that her finger would have been on the trigger guard area. Detective Oury did not recall collecting a pinkish jacket or sweater from the scene.

- 5 -

In her statement, Defendant said that she and the victim went to Derrick Raines' home to feed some dogs. They took a revolver with them that Defendant's aunt had given her. The gun originally belonged to Defendant's grandfather before he passed away. Defendant said that she and Defendant planned to take the gun to a pawn shop to get it appraised. At some point while they were at Mr. Raines' house, the victim asked Defendant to get the gun out of the truck. She said that the victim said, "be careful, it's ready to go." Defendant said "it felt like there were ridges under my thumb." Defendant and the victim were walking around, and Defendant said that she had the gun at her side down toward the ground. Defendant said that she and the victim walked to the truck to get a cigarette, and the victim asked her to hand the gun to him. She said, "He stopped and turned within arms reach to get it. He had turned a little bit stretching his arm out to get it and I raised the gun to hand it to him. He was just a little ahead of me and it went off." Defendant thought that shot hit the victim in the back. Defendant also said, "I remember walking with it, my finger was in the trigger guard."

Dr. Darinka Mileusnic-Polchan performed an autopsy on the victim. She testified that the cause of death was listed as a "through and through perforating gunshot wound of the back which involved the left lung and the heart." Her report further stated: "Examination of the skin surrounding the gunshot wound of entrance, as well as the back of the shirt surrounding the defect responding to the gunshot wound of entrance, does not demonstrate gunpowder residue deposit, which is consistent with the intermediate range of firing." Dr. Mileusnic-Polchan noted that the victim also had a "fresh wound" to his knee from falling to the ground after he was shot. Concerning the gunshot wound to the victim, Dr. Mileusnic-Polchan testified:

> People's exhibit 53 is one of the photographs that shows [the victim's] back and there is the gunshot wound of entrance and the location of the gunshot wound. We assigned the coordinates for the gun, the gunshot wounds whether they're entrance or exit. This is the entrance. From the top of the head close to eighteen inches and from the middle of the body about one inch to the left, so it's in the left back close to the middle close to the spine.

Dr. Mileusnic-Polchan further testified that the exit wound was located on the victim's left chest area "about 13 and a half inches beneath the top of the head, so it's slightly higher up that the entrance, and about one and a half inch to the left of the midline."

Concerning the trajectory of the gunshot, Dr. Mileusnic-Polchan testified:

> So that's one of the final shots that we typically do when possible to show the trajectory of the wound. In this case, the trajectory shows that it's from back to front slightly upward and it was just half an inch

- 6 -

difference between kind of slightly right to left, but in my report I pretty much said that it goes - - stays in the - - in one plane, so the main two directions dimensions are back to front and slightly upward.

She said that the victim's death was not instantaneous because it takes a while to bleed out. Dr. Mileusnic-Polchan opined that the victim would have lost consciousness within fifteen to thirty seconds, and death would have occurred within several minutes depending on the speed of bleeding. Dr. Mileusnic-Polchan testified that she observed some lividity from photographs of the side of the victim's face and on the victim's back after he was flipped over. She said that lividity was consistent with the victim's body being in the same place for a period of time.

On cross-examination, Dr. Mileusnic-Polchan testified that there were gravel imprints on the victim's face as well as his back. She agreed that he was on his face for a period of time "long enough to leave a gravel impression of the face and some blood settling on the right side of the face." The victim's body was also on its back for a period of time.

The trial court asked Dr. Mileusnic-Polchan questions that were posed by some of the jurors. She testified that the gunshot wound would have caused temporary paralysis to the victim and that if he had survived, he probably would have recovered some of the functions of his lower extremities because his spine was not severed. Dr. Mileusnic-Polchan testified that the victim was five feet eight inches tall, and she could not determine the distance between the victim and Defendant when the shot was fired. She did not find any gunpowder residue on the victim's hands, arms, or skin.

Steve Scott, a retired agent with the TBI, testified that he examined the gun in the present case before he retired. He also received a fired cartridge case and three unfired cartridges with the gun. He said that there were no external safety mechanisms on the gun and that "[t]here is internal inside the firearm a hammer block that is a safety mechanism." Concerning the hammer block, Agent Scott testified:

> A hammer block is a device inside the firearm not controlled by the shooter manually from the outside. It's not a button or a lever or anything like that, but it's a solid bar of metal that in this particular firearm, if the hammer is cocked to the rear, that is in the firing position. The hammer block is in a down position so it would fit within a recess that's on the hammer, and when the hammer - - if the trigger is pulled and held to the rear, the block of metal, that hammer block stays in that position so that it fits into that recess and allows the hammer to go fully forward allowing the hammer to cause the firing pin to strike the primer and cause the gun to discharge.

- 7 -

Now, if something tapped the trigger and did not completely hold it to the rear but overcame the spring pressure that's required to pull the trigger but did not completely hold it to the rear, that hammer block will move into a different position and the hammer will fall against that block and it prevents the hammer from striking that cartridge and causing firing when the gun is dropped if there's a jar off where it strikes a hard surface or something of that nature or if something taps that trigger with sufficient force to trip it but not sufficient force to hold it to the rear.

Agent Scott testified that he performed a "pencil test" on the revolver in this case to determine whether the hammer block functioned as intended. He fired the three remaining cartridges submitted with the gun and found the weapon to be in "normal operating condition." Concerning the pencil test, Agent Scott testified that a pencil was inserted into the barrel of the revolver, and he tapped the trigger with a pair of scissors. The pencil did not move when the trigger was tapped demonstrating that the hammer block was functional and prevented the firing pin from striking the end of the pencil.

Agent Scott also performed a trigger pull test on the weapon. He testified:

The trigger pull test is conducted using a stack of weights where individual amounts of weights can be added. Along with those weights there's a long bar that's got a hook at the top of it and we would place weights into that stack of weights, place the bar on the trigger and then try to pick those weights up with the trigger itself. As that bar contacts the trigger, then the trigger then is picking those weights up off of the table top and it is right at the junction where the weights come barely off the table top and the trigger trips, that weight is recorded. So I would do that in two different weights with this particular firearm. I would do it without it cocked, which is in the double action mode, and then I would also do it with it cocked in the single action mode, so there are two trigger pull weights or amounts for this particular firearm.

Agent Scott testified that the revolver required fourteen and one half pounds of pressure on the trigger in double action mode when the hammer was not cocked. When the gun was in single-action mode, meaning the hammer was already cocked, the trigger required five to five and one-eighth pounds of pressure to overcome the safety mechanism and cause the revolver to fire. Special Agent Scott testified: "I found the firearm to be in normal operating condition, the safety feature present within it, the hammer block's operating condition as well. I found no reason to believe that this firearm would discharge any other way than by pulling the trigger."

Agent Scott also performed a "muzzle-to-target" test on the victim's shirt to look for gunshot residue on the shirt. He did not find any gunpowder residue but he did find

lead residue which was consistent with the passage of a bullet through the garment. Agent Scott could not determine the distance from which the shot was fired, and he was certain that it was not a "contact gunshot."

Defendant's 9-1-1 call was played for the jury. She was crying when the dispatcher answered the phone, and the dispatcher repeatedly instructed Defendant to calm down and catch her breath in order to be understood. Defendant told the 9-1-1 operator that the victim asked her to hand him the gun, but it discharged when she tried to give it to him.

**Defense Proof**

Defense counsel recalled Agent Scott as a witness. He testified that a firearm such as a revolver "generally will leave residues out to about four feet and after four feet there's no residues left on the target material." However, that did not mean that the revolver in this case would have been fired a distance of more than four feet or in this case three to four feet from the shirt. Agent Scott testified: "I can't interpret any test - - if I don't find any residues on the garment, any gunpowder residues, then I can't interpret that test close or further out." Concerning gunpowder residues from the revolver in the present case, Agent Scott testified:

> I found that this particular gun with the ammunition that was supplied with it, which was federal brand .38 special plus P that carried a 125[-] grain jacketed hollow point bullet, those cartridges were the same as the cartridge case. Bullet was not recovered so I don't know what kind of projectile it was. But when I test fired the gun with those three cartridges, I test fired them at 24, 36, and 48 inches. On the 48 inch pattern there were some gunpowder residues when I add it up on my target back, but as I removed it, those residues fell off, so that would be something that could happen on a target material such as a shirt particularly if an individual was moving, falling, being turned over on to back for EMS personnel to work, anything of that nature. So with this particular gun using that ammo, I found that this gun will leave residues on target material between 36 and 48 inches.

Agent Scott could not "say anything about how far the gun was from the target material because [he] found no evidence of any kind related to that." However, he would have "expected it within 36 to 48 inches."

On cross-examination, Agent Scott agreed that the material that he used to test-fire the revolver was clean and dry. The victim's shirt was soaked in blood which can sometimes mask the test if the blood is thick and heavy. Agent Scott testified that an "accidental discharge" meant that "there's a dysfunction within the firearm that caused a

mechanical dysfunction." Otherwise a discharge of a weapon would be classified as an "unintentional discharge" if the trigger was not intentionally pulled. Agent Scott found nothing wrong with the revolver in this case. He noted that the gunshot wound in this case was not a "contact gunshot."

Gary Shaffer is a Marine Corps Veteran and a former military police officer who had trained other officers and carried a firearm "almost every day for over fifty years." Mr. Shaffer also worked as a police officer, sergeant and traffic coordinator for the Knoxville Police Department for thirty-one years. He spent a total of twelve years "as the primary instructor in the police academy for the Knoxville Police Department." The State stipulated as to his expertise in firearms.

Mr. Shaffer testified that he was asked to examine the firearm in the present case, and he determined that it was operating normally. He further testified:

> I reviewed first of all the statement by the defendant, the handwritten statement, and then later reviewed or heard the audio recording of the interview that substantiated the written documents. I reviewed the TBI's report on the examination of the firearm, the laboratory test done on the ammunition and the clothing that was done. I personally examined the firearm and the clothing here and then I examined the autopsy report by the medical examiner and used her specific examination and her explanation, her report as to the location of the entrance and exit wounds to determine the approximate trajectory of the round that struck [the victim].

Mr. Shaffer also visited the crime scene, and he reviewed the video of Defendant's demonstration of what happened during the shooting. He said that the manner in which Defendant handed the gun to the victim was not an intentional firing position. Mr. Shaffer testified:

> Normally when people fire handguns, experienced or inexperienced fires, if they intend to strike an object or a person, they will bring the weapon up to shoulder level or eye level in order to properly align the gun to the target. It appeared from [Defendant's] statement and then from my calculations based on the autopsy report that this weapon was discharged at a much lower level, probably in the neighborhood of - - I'm estimating, but we can see it directly, below her waist, which means that she was probably lifting the gun up reaching it out toward [the victim] whenever it discharged rather than it being elevated, aimed and then deliberately discharged.

Mr. Shaffer said that the trajectory of the bullet showed that the "exit wound was four point three inches higher than the entrance wound. This is a very dramatic rise considering the thickness of a human torso." Based on the victim's height and Defendant's height, Mr. Shaffer was able to extrapolate the height from which the gun was fired. He said that the further away from the victim, the lower the gun was fired. Mr. Shaffer noted that if the gun was three feet behind the victim, Defendant would have been down on her buttocks to create the trajectory of the bullet when the weapon was fired. He further testified: "If you was going to bring the weapon up to where she could sight it, she would have to kneel down and fire up like this[.]" Mr. Shaffer testified that at four feet away, the muzzle of the gun would have been thirty-one inches off the ground, which would have meant that the gun was at Defendant's mid-thigh when it was fired.

Mr. Shaffer testified that the shooting in this case was unintentional. He said: "And my rationale is if a person intended to shoot someone that they would attempt to align the weapon with the target and there's no way this this [sic] gun was aligned with the target." Mr. Shaffer further testified:

> [T]hat's what struck me whenever I first looked at the case and saw the autopsy report, what struck me was this dramatic rise of four point three inches through the width of a ten inch torso. That's just - - that's a 23 point three degree angle, which is too acute, too dramatic to have been a deliberately aimed shot.

On cross-examination, Mr. Shaffer testified that an intentional shot means that the shooter raises the gun up to their shoulder and that the "shooter usually aims or points the weapon in such a way they can better determine where the bullet is going to strike." Mr. Shaffer agreed that he could not tell the jury that a shooting was intentional because the gun was held in a certain position. He testified, "I just say that it - - a trajectory such as the one in this case is so dramatic that is opposed to everything in my experience of seeing a deliberately placed shot." Mr. Shaffer agreed that he checked the gun, and the trigger had to be pulled to make it fire.

Alfreda Huff, Defendant's aunt, testified that she and her sister, Phyllis Bryant, were shopping on October 29, 2013, when they received a telephone call indicating that there had "been an accident and that [Defendant] needed us badly." Ms. Huff and Ms. Bryant drove to the scene and saw a truck sitting in the driveway. There was no ambulance on the scene at the time, and another lady was there. Ms. Huff testified that Defendant was in "horrible shape," and she was vomiting and crying. Defendant said that she accidently shot the victim and she pointed to his body. Ms. Huff could only see his sneakers at the time. She said that an ambulance and law enforcement officers arrived, and one of them brought a chair for Defendant to sit in. She said, "And they [were] wanting to clean the blood off her hands and arms." Ms. Huff testified that

Defendant was screaming, "No, no, it's [the victim's] blood, it's [the victim's] blood, but they finally calmed her - - we finally calmed her down enough and she held her hand out to them." Ms. Huff testified that her relationship with Defendant and the victim was good and that Defendant and the victim had a good relationship.

Phyllis Bryant, Defendant's aunt, testified that Defendant and the victim lived with her at the time of the shooting along with their three-year-old daughter. Defendant was employed as a waitress in Gatlinburg. Ms. Bryant testified that she got along "wonderful" with Defendant and the victim, and there were no problems. They also helped her tremendously. Ms. Bryant testified that the gun used in the offense belonged to her father, Defendant's grandfather, and she gave it to Defendant as a keepsake. She had never known Defendant or the victim to shoot the gun.

Ms. Bryant testified that she spoke with Defendant and the victim on the morning of October 29, 2013, and they were both happy. She said that Defendant was wearing a pair of red pants, a white shirt, and a plaid jacket trimmed in red when she left the house that morning. Ms. Bryant testified that a lady called her while she and Ms. Huff were on their way to eat and said that there had been an accident involving the victim. Ms. Bryant testified that the ambulance was not there when she and Ms. Huff arrived at the scene, and Defendant was standing near the trailer with a woman. She said that Defendant was in "awful shape." Ms. Bryant testified that Defendant "was just out of it," and "screaming and hollering and just like a wild person[.]" She said that Defendant was wearing a white shirt and red pants, and she had blood "all over her." Defendant was not wearing the red jacket, and Ms. Bryant said that she saw it lying near a bicycle, and the jacket was covered in blood. Ms. Bryant testified that she and Ms. Huff calmed Defendant down and asked her what happened. She said that Defendant did not want the blood wiped from her hands because it was the victim's blood. Ms. Bryant testified that Defendant told her that the shooting was an accident. She said that Defendant is a very peaceful and truthful person.

**Analysis**

*I.    Sufficiency of the Evidence (Defendant's Issues I and II)*

Defendant argues that the evidence was insufficient to support her conviction for reckless homicide. She further contends that the trial court erred when it denied her motion for judgment of acquittal and that the trial court failed to perform its duty as the thirteenth juror.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see*

*also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id.* (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

This Court has said that "[i]n dealing with a motion for a judgment of acquittal, unlike a motion for a new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *See State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). An appellate court must apply this same standard when reviewing the denial of a motion for judgment of acquittal. *See Adams*, 916 S.W2d at 473.

Tennessee Rule of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-719 (Tenn. Crim. App. 1993). Applying those principles to the record in this case, we conclude that the trial court fulfilled its duty to act as thirteenth juror. Therefore, we are limited to reviewing the sufficiency of the evidence.

Reckless homicide is defined as the "reckless killing of another." T.C.A. § 39-13-215(a).

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31). In this case, viewing the evidence in a light most favorable to the State, a reasonable juror could have concluded that the evidence was sufficient to support Defendant's conviction for reckless homicide. The victim asked Defendant to retrieve the revolver from the truck, and he warned her that the gun was "ready to go." In her statement to police, Defendant said that she felt that the hammer was pulled back when she retrieved the gun so that her thumb rested on the ridged top of the hammer. She also said that she had her finger inside the trigger guard. When the victim reached back for the gun, Defendant raised the weapon up so that the revolver was pointed at the victim's back. According the Agent Scott's testimony, Defendant had to have pulled the trigger with at least five to five and one-eighth pounds of pressure, and she held the trigger back long enough for the revolver's internal safety mechanism to disengage, allowing the gun to fire. Agent Scott found no reason to believe that the revolver would discharge any other way than by pulling the trigger.

Although Defendant argues that there were some discrepancies in the proof, the jury resolved those discrepancies in favor of the State. Also, we acknowledge that Defendant claimed that the shooting was accidental; however, the jury chose to convict Defendant of reckless homicide, and the evidence was sufficient to support the conviction. Defendant is not entitled to relief on this issue.

II.     *Denial of the Opportunity to File an Amended Motion for New Trial (Defendant's Issue IV)*

Defendant argues that the trial court erred by denying her motion for an extension of time to file an amended motion for new trial. Although not raised by the State, we note that Defendant has failed to include the transcript for the motion for new trial hearing in the appellate record. The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. *See* Tenn. R. App. P. 24(b). If an incomplete record is presented to this court, the appellant risks waiving issues raised on appeal. However, waiver notwithstanding, we will address the issues on their merits.

- 14 -

In this case, the sentencing hearing was held on July 19, 2017. At the conclusion of the sentencing hearing, the following exchange took place concerning the filing of a motion for new trial:

[Defense Counsel]:     We would ask for 30 days, of course, to file a motion for new trial.

THE COURT:          I'll do that. I'm -- I'm not going to send her to custody now. I -- I will let you file your motion for new trial, and remembering that it will be set and heard because I can't let this thing go past August the 31st.

[Defense Counsel]:     I thought you had a wrap-up period.

THE COURT:          I don't think so.

[Defense Counsel]:     I think you have 60 days. I -- I -- listen, I -- I don't . . .

THE COURT:          I think I was told differently.

[Defense Counsel]:     Well, we'll . . .

THE COURT:          And so I'll -- I'll not take any chance on that because that -- it would be a -- talk about a miscarriage of justice, it would be a miscarriage of justice to everybody, have to try this again. So we'll . . .
                    You get -- get that – get it filed as quickly as possible. [     ].

The trial court then agreed that the hearing on the motion for new trial would be held on August 22, 2017. Defendant did not object to the hearing date. Defendant filed a motion for new trial on August 14, 2017. She also filed a "Motion to Enlarge the Time to Amend the Motion for New Trial" and asked to be able to file amendments to the motion for new trial until 15 days after the transcripts were file with the court clerk. The State filed a response opposing the motion for an extension of time. Defendant never filed an amended motion for new trial nor did she file a motion seeking permission to file an amendment. A hearing on the motion for new trial was held on August 22, 2017, and the motion for new trial was denied. It is not clear from the record whether the trial court specifically granted or denied Defendant's motion for an extension of time. The judgment for Defendant's reckless homicide conviction was entered on August 29, 2017,

- 15 -

after the hearing on the motion for new trial. The order denying Defendant's motion for new trial, entered on August 31, 2017, contains the following language:

> **THIS CAUSE** having come before this Honorable Court on this the 22nd day of August 2017 for ruling upon Defense's <u>Motion for New Trial</u>, <u>Motion for Acquittal</u> and various other <u>Motions</u> the Court having fully reviewed the record, the Court's notes, documents submitted by the parties, arguments of both the parties and, again, based upon the record as a whole.
>
> **IT IS THEREFORE ACCORDINGLY ORDERED, ADJUDGED AND DECREED** that the Defendant's motions are denied, the Court's sentence imposed based upon the Jury conviction stands and the Defendant shall remain on a $25,000.00 bond pending appeal in this matter.

Tennessee Rule of Criminal Procedure 33(b) provides:

> A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered. The court shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial.

Defendant asserts that because the judgment was not entered until August 29, 2017, that his motion for new trial "was not due until September 28, 2017. However, the motion for new trial, which Defendant asserts was "from memory and notes," was prematurely filed on August 14, 2017. The State did not object to the premature motion for new trial. Defendant claims on appeal that she was denied the opportunity to be "'liberally' allowed time to file amendments to her premature Motion for New Trial in order to review the transcript." She further argues:

> The function of a Motion for Trial is to provide a trial judge notice and an opportunity to correct errors at the trial level. Respectfully, the trial court did not address any of [Defendant's] claims pleaded [sic] for a new trial in the [sic] August 14, 2017, because the Trial Court was pressed by the imposed deadline of August 31st. Accordingly, it is reasonable for [Defendant] to argue that it would have made no difference what amendments [Defendant] may have filed after reviewing the transcript because those amendments, like the claims in the motion for new trial would have been only a formality, and summarily denied, thereby being [a] futile act in the Trial Court.

- 16 -

In *State v. Hatcher*, 310 S.W.3d 788, 799-800 (Tenn. 2010), the supreme court stated:

> Rule 33 clearly contemplates that the trial court will conduct the sentencing hearing and enter the uniform judgment order *before* any motion for new trial is filed. The defense then has thirty days from entry of the judgment order in which to file its motion for new trial. As this Court and the Court of Criminal Appeals have often repeated, this thirty-day period is jurisdictional and cannot be expanded. *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); *see also* Tenn. R. Crim. P. 45(b)(3) ("The court may not extend the time for taking any action under Rules of Criminal Procedure 29, 33 and 34, except to the extent and under the conditions stated in those rules."). Once a motion for new trial is timely filed, leave to amend should be liberally granted, and the trial court should not hold the hearing on the motion for new trial until the defense has had an adequate opportunity in which to file its amendments.

In *Hatcher*, as in the present case, the defendant filed a premature motion for new trial "prior to the date on which the thirty-day period even began to run." The trial court in *Hatcher* also heard and ruled upon the motion for new trial before sentencing was complete and before the judgments of conviction and sentencing were issued. As in this case, the prosecutor did not object to the timing of the hearing on the motion for new trial. *Id*. at 800. The supreme court further said:

> Our Court of Criminal Appeals has considered cases in which the defense filed prematurely its motion for new trial. For instance, in *State v. Siliski*, 238 S.W.3d 338 (Tenn. Crim. App. 2007), the defendant filed her motion for new trial on October 26, 2004, although judgment was not entered until December 21, 2004. Noting that the motion for new trial was therefore premature, the intermediate appellate court nevertheless considered the issues raised therein, emphasizing that (1) the State had not raised the issue on appeal, and (2) no prejudice accrued to the State from the court's consideration of the issues raised in the premature motion. *Id*. at 374 (citing *State v. Lee*, No. 01C01-9806-CC-00266, 1999 WL 346196, at *5 (Tenn. Crim. App. June 2, 1999)). Similarly, the State has not raised an issue about the premature filing of the defense's original motion for new trial in this case. Nor is any prejudice to the State apparent from consideration of the issues raised therein. For the purposes of this case, we hold that the original motion for new trial was filed timely.

*Hatcher*, 310 S.W.3d at 800. Likewise in this case, we hold that Defendant's motion for new trial was timely filed on August 14, 2017, and she did not have until September 28, 2017, to file her motion for new trial and amendments to the motion as Defendant asserts in her brief.

As pointed out by the State, the trial court did not deny Defendant the right to file an amended motion for new trial prior to the hearing on August 22, 2017. Defendant at no point filed an amended motion for new trial or requested permission to file an amended motion for new trial. Instead, she filed a motion for an extension of time to file an amended motion for new trial. As argued by the State, there is nothing in the rules of criminal procedure that contemplate a "motion for enlargement of time to file an amended motion for new trial. *See* Tenn. R. Crim. P. 33(b). Defendant had "until the day of the hearing on the motion for new trial," but not after the trial court entered an order denying a new trial, to file an amended motion for new trial. *Hatcher*, 310 S.W.3d at 803.

We also find that Defendant has not shown any prejudice by the trial court's denial of her motion for an extension of time to file an amended motion for new trial. Defendant has not alleged in her brief what issues she would have raised in the amended motion for new trial. Therefore, Defendant is not entitled to relief on this issue.

### III.    *Superseding Indictment*

Defendant asserts that the Cocke County Grand Jury did not have "jurisdiction to render a superseding presentment against [Defendant] for the same offenses that was pending before the Cocke County Criminal Court." She essentially argues that the grand jury could not issue a superseding presentment without the State first seeking leave from the trial court to do so. Defendant further claims that she was denied the right to due process when the State sought a superseding presentment as opposed to moving the trial court to amend the presentment. She argues that the initial presentment was never dismissed and that there were two presentments pending against her at the same time for the same offenses. Defendant also argues that the State was required to elect which presentment it was proceeding under.

The State is "given broad discretion over the control of criminal prosecutions." *State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000). "The power to seek a superseding indictment lies within this broad discretion of the State." *Id.* The supreme court in *Harris* further stated:

> A superseding indictment is an indictment obtained without the dismissal of a prior indictment. 41 Am. Jur. 2d *Indictments and Informations* § 54 (1995). Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused

- 18 -

even though another indictment is pending. *Id*.; *see also United States v. Eshkol*, 108 F.3d 1025, 1027 (9th Cir.1997). Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

*Id*.

We note that indictments and presentments are "virtually identical in purpose." *State v. Tonya Lea Chandley*, No. E2006-02366-CCA-R3CD, 2007 WL 3379787, at *5-6 (Tenn. Crim. App. Nov. 15, 2007). The general purpose of either is to advise the accused of the offense with which he or she is charged. *See, e.g., Stanley v. State*, 171 Tenn. 406, 104 S.W.2d 819, 821 (Tenn. 1937). The form of a presentment is often, by practice, sufficiently similar to the form of an indictment. The use of the term indictment includes a presentment "whenever the context so requires or will permit." T.C.A. § 40-13-101(b) (2006). A presentment is derived directly from article I, section 14, of the Tennessee Constitution, which provides "[t]hat no person shall be put to answer any criminal charge but by presentment, indictment or impeachment." The grand jury has "inquisitorial powers over and shall have authority to return a presentment of all indictable or presentable offenses found to have been committed or to be triable within the county." Tenn. R. Crim. P. 6(d). "That power enables the grand jury to act independently of a court and the district attorney by instituting a criminal action by virtue of a presentment." *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 661 (Tenn. 1994).

Generally, "a motion alleging a defect in the indictment, presentment, or information," including challenges to the constitutionality of an underlying criminal statute, must be raised prior to trial. Tenn. R. Crim. P. 12(b)(2)(B). However, "[a] valid indictment is an essential jurisdictional element, without which there can be no prosecution." *Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998). Accordingly, "at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information *fails to show jurisdiction in the court* or *to charge an offense*." Tenn. R. Crim. P. 12(b)(2)(B)(emphasis added).

In this case, Defendant objected to the original presentment because the language of the presentment did not specifically state that the crimes occurred in Cocke County, and Count 2 incorrectly referenced the statute for second degree murder rather than the applicable statute for reckless homicide. Defendant then asked that Count 2 be amended to reference the correct statute. She also argued that the failure to include Cocke County in the language of the charge required the presentment to be dismissed. The State agreed that the presentment needed to be amended to correct the clerical error in Count 2 but did

not agree that the presentment should be dismissed for failure to include Cocke County. The State then sought the superseding presentment in order to include the language that the grand jury was "summoned, elected, impaneled, sworn, and charged to inquire for the body of Cocke County" and to correct the clerical mistake in Count 2. Defendant did not challenge the presentment until the motion for new trial.

Defendant has not alleged that the presentment fails to show jurisdiction in the trial court or that it fails to charge an offense. As noted by the State, Defendant attempts to frame her argument as a jurisdictional issue by stating that the grand jury "did not have jurisdiction to amend the presentment" and that the State did not have authority to seek a superseding indictment. However, as pointed out by the State, these claims challenge the procedure the State used to correct the errors which were identified by Defendant in the original presentment. Therefore, any motion alleging a defect in the presentment must have been raised prior to trial. Tenn. R. Crim. P. 12(b)(2)(B); *See State v. Nixon*, 977 S.W.2d 199, 120-21(Tenn. Crim. App. 1997)(non-jurisdictional challenges to a charging instrument must be raised prior to trial). Defendant has waived this issue and is not entitled to relief. We also decline to review the issue for plain error

### IV. *Peremptory Challenge Procedure (Defendant's Issue V).*

Defendant argues that the trial court improperly denied her "Tenn. R. Crim. P. 24(e)(4) rights to peremptory challenges during voir dire." Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). The rules "prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." *State v. Coleman*, 865 S.W.2d 455, 458 (Tenn. 1993). When a defendant alleges error in the jury selection process, "[i]t is the burden of the defendant to prove prejudice or purposeful discrimination in the selection of a jury. Prejudice will not be presumed." *Id.*

T.C.A. § 40-18-118 provides:

**Peremptory challenges**

Notwithstanding any other provision of law or rule of court to the contrary, in any case in which a defendant is charged with an offense punishable by death, the defendant is entitled to fifteen (15) peremptory challenges and the state is entitled to fifteen (15) peremptory challenges for each such defendant. If the offense charged is punishable by

imprisonment for more than one (1) year but not by death, each defendant is entitled to eight (8) peremptory challenges, and the state is entitled to eight (8) peremptory challenges for each defendant. If the offense charged is punishable by imprisonment for less than one (1) year or by fine, or both, each side is entitled to three (3) peremptory challenges for each defendant.

Additionally, Rule 24(e) states:

**Number of Peremptory Challenges.**

(1) *Death Penalty.* If the offense charged is punishable by death, each defendant is entitled to fifteen peremptory challenges and the state is entitled to fifteen peremptory challenges for each defendant.
(2) *Imprisonment More Than Year.* If the offense charged is punishable by imprisonment for more than one year, each defendant is entitled to eight peremptory challenges and the state is entitled to eight peremptory challenges for each defendant.
(3) *Imprisonment Less Than Year or Fine.* If the offense charged is punishable by imprisonment for less than one year or by fine or both, each side is entitled to three peremptory challenges for each defendant.
(4) *Additional Jurors.* For each additional juror selected pursuant to Rule 24(f), each side is entitled to one peremptory challenge for each defendant. Such additional peremptory challenges may be used against any regular or additional juror.

Concerning the selection of additional jurors in order for one or more alternate jurors to be available for a trial, Tenn. R. Crim. P. 24(f)(2) provides:

(f) Additional Jurors. Before jury selection begins, the court may call and impanel one or more jurors in addition to the regular jury of twelve persons. The following procedures apply:
(1) Same as Regular Jurors. The additional jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors.
(2) Methods of Impaneling Additional Jurors. The trial court may use either of the following methods to select and impanel additional jurors:
(A) Single Entity. During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the

law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

(B) Separate Entities. Following the selection of the jury of twelve regular jurors, the additional jurors shall be selected and impaneled as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

A trial court's deviation from jury selection procedures is considered non-constitutional error. *State v. Frausto*, 463 S.W.3d 469, 484 (Tenn. 2015). In order to obtain relief when a deviation has occurred, a defendant must show that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *See* Tenn. R. App. P. 36(b); *Frausto*, 463 S.W.3d at 484; *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

The transcript reflects that the trial court in this case selected the jury by using the separate entity method. Each party was given eight peremptory challenges for selection of the twelve member regular jury. They were also given two peremptory challenges to be used when three alternate jurors were picked. Twenty names were initially called for the regular jury. Each party was then allowed to exercise their peremptory challenges to the twelve potential jurors seated in the box. Replacement jurors were selected from the remaining eight people who were called. Additional replacement jurors were called as needed from the venire. During the jury selection, Defendant asked for a bench conference, and the following exchange took place:

> [Defense counsel]: Now, as I understand, if we do not challenge now, we don't have anymore alternates or anything else; is that the way it goes?
>
> The court: You've each got eight challenges and I'm going to start giving new challenges on the alternates. I thought we said we would pick three and you all would be given two challenges.
>
> [Defense counsel]: On the first two or something like that.
>
> [The State]: You get eight and then you get two for the alternates. You can't use the two in the original and you can't hold over any to get to the alternates.
>
> [Defense counsel]: Right. My point is though I think I've used - -

- 22 -

The court:                    I think it's six.

[Defense counsel]:            I've got six.   If I don't - - if I don't use anymore, then I'll have one for an alternate and another for an alternate.

The court:                    Yeah, you still have two, but the two don't have anything to do - - your eight has nothing to do with the other two.

[Defense counsel]:            With the two, so I'll have two more in other words if I rest right now?

The court:                    You've got two more regular and two for alternates.

[Defense counsel]:            So my point is if I don't use my other two regulars, I still have two alternates?

The court:                    Yes.

[Defense counsel]:            Okay.

    The parties went through two more rounds of peremptory challenges.  During the second round of challenges, Defendant asked to approach the bench, and the following exchange took place:

[Defense counsel]:            I'm about to exhaust, I know that, but does that mean my two alternates I can strike out of the whole box (inaudible) or am I just limited to the alternates?

The court:                    You're going to have two for the alternates.

[Defense counsel]:            That's right.   But can I exercise out of the box?

[Co-counsel]:                 Can we use those on the whole box or just the alternates?

The court:                    You've got eight for the original twelve.

[Defense counsel]:            That's right.

- 23 -

| The court: | You've run - - used them up. Whoever's next is going to be on the jury. |
|---|---|
| [Co-counsel]: | I guess the question is so we have these additional ones. Can we strike into the box of the original twelve? |
| The court: | No. |
| [Co-counsel]: | Can we withdraw? |
| [Defense counsel]: | We need to withdraw ours. |
| The court: | Okay. |
| [Co-counsel]: | Thank you. |
| The court: | Yes. |

There were then two more rounds of peremptory challenges for the regular jury. From the record, it appears that Defendant exhausted her peremptory challenges for the alternates. Defendant did not object to the jury selection procedure, and she did not request any additional peremptory challenges.

On appeal, Defendant argues that she was denied one peremptory challenge during the selection of the alternate jurors and that the court improperly prevented her from backstriking jurors from the box of twelve while the parties were considering alternate jurors.

Initially, we note that Defendant filed a pre-trial motion requesting a conference "to discuss and establish Tenn. R. Crim. P. 24 voir dire procedures." She further asked the trial court to consider the case of *State v. Frausto*, 463 S.W.3d 469 (Tenn. 2015) and "provide [Defendant] with an [o]pportunity to review and better understand how [the trial court] conducts its jury selections prior to trial." It appears from the record that there was a "motions day" hearing. However, the transcript of that hearing was not included in the record on appeal, and there is no ruling from the trial court on the pre-trial motion. The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. *See* Tenn. R. App. P. 24(b).

In any event, we agree with the State that Defendant has waived this issue for failing to contemporaneously object to the jury selection procedure used by the trial court. Although Defendant asked for clarification about the procedure used, she did not raise any objection to the jury selection procedure or request any additional peremptory

challenges. Therefore, this issue is waived. *State v. Michael Flamini*, No. E2008-00418-CCA-CD, 2009 WL 1456316, at \*3 (Tenn. Crim. App. May 26, 2009)(the failure to raise a contemporaneous objection to the jury selection process waives the issue); *State v. Paul E. Mathis*, No. 01C01-9605-CC-00223, 1998 WL 792222, at \*3 (Tenn. Crim. App. Nov. 16, 1998)(failure to contemporaneously object to a deviation from Rule 24's procedure results in waiver of the issue on appeal).

Additionally, as pointed out by the State, this issue is also waived because Defendant failed to raise it in her motion for new trial. Defendant's motion for new trial states: "Respectfully, the [c]ourt erred by denying [Defendant] her request for additional peremptory challenges." Again, as pointed out above, Defendant did not request any additional peremptory challenges. She asked for clarification about jury selection procedure. As argued by the State, Defendant's allegation in the motion for new trial does not "address the trial court's procedure limiting the parties to two peremptory strikes for the three alternate jurors or prohibiting the use of peremptory strikes during the alternate juror selection process to backstrike jurors in the regular jury." Tenn. R. App. P. 3(e) provides that

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

We also find that Defendant has not established that the trial court's minor deviation from the jury selection process in Tenn. R. Crim. P. 24 more probably than not affected the judgment in this case or resulted in prejudice to the judicial process. Tenn. App. P. 36(b). Defendant was charged with second degree murder and reckless homicide, and the jury acquitted her of the greater offense. *State v. Jarmarcus Jackson*, No. E2017-01182-CCA-R3-CD, 2018 WL 3409927, at \*10 (Tenn. Crim. App. July 12, 2018)(defendant not prejudiced by trial court's minor deviations from Tenn. R. Crim. P. 24 when the jury acquitted him of the charged offense and convicted him of a lesser-included offense); *State v. Zachary Gale Rattler*, No. E2015-01570-CCA-R3-CD, 2016 WL 6111645, at \*9 (Tenn. Crim. App. Oct. 19, 2016)(the trial court's prohibiting backstriking was a minor deviation from Rule 24 and did not result in prejudice to the judicial process); *State v. Pamela Taylor*, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at \*22 (Tenn. Crim. App. Sept. 30, 2014)(trial court's decision to prematurely end voir dire before defendant used her last two peremptory strikes was not prejudicial when defendant had "presented absolutely no evidence that the jurors that decided her case were not competent, unbiased, and impartial"). Defendant is not entitled to relief on this issue.

*V.      Detective Oury's Out-of-Court Communication*

Defendant argues that the she was prejudiced by a violation of the rule of sequestration by the State's witnesses. Tennessee Rule of Evidence 615 states the following:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615. This rule "codifies the long-established practice of sequestering witnesses during a trial so that they may not hear one another testify prior to testifying themselves." *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010).

> The purpose of this rule is "to prevent one witness from hearing the testimony of any other witness and adjusting his testimony . . . ." *Smith v. State*, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977). The decision to sequester a witness is left to the sound discretion of the trial court, and we will not reverse the trial court's decision absent evidence that the moving party was prejudiced. *State v. Chadwick*, 750 S.W.2d 161, 166 (Tenn. Crim. App. 1987). Trial courts also have discretion in determining whether to impose a sanction on a party that violates the sequestration rule. *State v. Moffett*, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986). Sanctions can include declaring a mistrial, ruling for or against a party on a particular issue, holding the violating witness in contempt, "allowing the offender to testify but subjecting her to cross-examination about her violation, the testimony she heard, and the impact it may have had on her testimony [,]" instructing the jury to consider the violation when assessing the offending witness' credibility, or exclusion of the witness. *State v. Jordan*, 325 S.W.3d 1, 41-42 (Tenn. 2010) (internal citations omitted). However, declaring a mistrial is a

drastic measure that should be reserved for intentional violations of Rule 615. *See id.* at 41.

*State v. Stephen Demps*, No. M2017-00641-CCA-R3-CD, 2018 WL 1091747 (Tenn. Crim. App. Feb. 27, 2018). Trial courts generally hold a jury-out hearing to determine "both the facts of the violation and the appropriate sanction." *State v. Coulter*, 67 S.W.3d 3, 52 (Tenn. Crim. App. 2001), *disagreed with on other grounds* in *State v. Jackson*, 173 S.W.3d 401, 407 & n. 3 (Tenn. 2005).

> Once the facts of the violation are established, the appropriate sanction will generally depend upon the following factors: (1) the harm caused by the sequestration violation; (2) the importance of the testimony of the witness who ignored the sequestration decree; and (3) who was at fault in the violation, i.e., was it accidental or intentional? Neil P. Cohen et al., *Tennessee Law of Evidence* § 615.4, at 431 (Michie ed., 3d ed.1995).

*Coulter*, 67 S.W.3d at 52. In reviewing the trial court's exercise of its discretion, this court must consider "the seriousness of the violation and the prejudice, if any, that enured to the [appellant]." *State v. James Edward French*, No. 03C01-9503-CR-00096, 1996 WL 138289, at *6 (Tenn. Crim. App. at Knoxville, March 28, 1996).

In this case, during the State's case-in-chief, Keith Haas, an assistant public defender, interrupted the proceedings and informed the trial court that he saw Detective Jason Oury, a State's witness, approach Lieutenant Ricky Holt as Lieutenant Holt was leaving the courtroom after his testimony. Mr. Haas told Detective Oury that he could not discuss the testimony. The trial court conducted a jury-out hearing to determine the nature and extent of the sequestration violation.

Lieutenant Holt testified that he was approached by Detective Oury as he left the courtroom, and Detective Oury asked "if it was bad, if it got real, real bad in here." Detective Oury did not ask any specific questions about Lieutenant Holt's testimony. Lieutenant Holt testified: "[H]e just more or less asked me if – he was worried about the defense slamming me. I told him it wasn't bad. You know, if I didn't know the answer, I told them I didn't know." He also told Detective Oury that defense counsel asked where "certain stuff was" but Lieutenant Holt could not recall. Lieutenant Holt also thought that he told Detective Oury that he could not testify as to where the victim was shot because Lieutenant Holt did not know. He said that Detective Oury did not ask him where the victim was shot. He testified that Detective Oury only asked if "they drill[ed] you," and Lieutenant Holt told him they did not.

Detective Oury testified that he approached Lieutenant Holt and asked, "How bad was it?" He said that Lieutenant Holt responded by saying, "It wasn't that bad, they asked me a bunch of questions I didn't know the answer to or couldn't answer."

- 27 -

Detective Oury testified that Lieutenant Holt said "something specifically about in your 20 years of law enforcement could you not tell a wound, that that was the end of the statement." He also recalled that Lieutenant Holt mentioned "something about a garment, but he didn't identify it or describe it, any type of thing like that." It was at that point that Mr. Haas stopped the conversation. Detective Oury testified that Officer Bryan Murr also joined the conversation near the end at approximately the time that Mr. Haas intervened, but he did not recall that Officer Murr was present "for any length of time." Detective Oury said that he took responsibility for the conversation and that he made a mistake.

Officer Murr testified that he was on his way to the restroom when he paused and heard Detective Oury talking to Lieutenant Holt. He said that Detective Oury was "concerned about how the defense [was] going to be toward him, if it was going to be bad or – and that was basically the extent of what [Officer Murr] heard." Officer Murr testified that Mr. Haas was sitting around the corner and became "extremely upset" and stopped the conversation. Officer Murr thought that he heard Lieutenant Holt mention "something about maybe a gunshot wound to the chest." His impression of Lieutenant Holt's comment was that defense counsel thought Lieutenant Holt would "know more than he did prior to his arrival." Officer Murr reiterated that Detective Oury's main concern was how badly defense counsel would treat him on cross-examination.

The trial court made the following findings concerning the issue:

> I don't see anything that would prejudice the defendant, so it's my intention to proceed with the trial and we'll see what happens. It may be that one of the reasons I want the transcript typed up is in case anybody wants to pursue the matter any further or if the - - if Jimmy Dunn, our Attorney General wants to look at it or the sheriff wants to look at it, anybody else that - - I sure wish that it hadn't happened, but I'm really - - when I say I find no prejudice to you, I don't find any.

The trial court did not abuse its discretion by finding that Defendant was not prejudiced by the out-of court communications by Detective Oury and the other officers. In her brief, Defendant argues the following:

> [Defendant] acknowledges that State law enforcement witnesses['] violations of the rule of sequestration of witnesses, and a finding of no prejudice, standing alone, may not have been an abuse of discretion. However, here the violations centered around, how the defense was questioning witnesses; that the defense was asking about a shot in the chest; that the defense was asking about the garment [the red sweater]. All the content of those discussions were material to the credibility of [Defendant's] statements that the firing of the gun was an accident and

the thin line between the prosecutor attempting to paint [Defendant] as a liar and an actor. The issues discussed were issues that were the difference between [Defendant] being acquitted or [Defendant] being found guilty of reckless homicide.

At trial, Detective Oury did not testify concerning any details about where the victim was shot. The evidence at trial, which included testimony from the medical examiner, was that the victim was shot in the back. Detective Oury could not recall seeing a pink or red sweater at the scene, and he collected the clothing that Defendant was wearing when he arrived. At trial, defense counsel showed Detective Oury a photograph of various items sitting outside Derrick Raines' house, which included a red or pink garment. However, Detective Oury did not recognize the pink garment or collect it from the scene. The garment was not introduced at trial. Accordingly, we do not find that Detective Oury adjusted his testimony to conform to that of Lieutenant Holt's testimony. Furthermore, Defendant did not cross-examine Detective Oury about the out-of-court communications. This "suggests an absence of any urgent concern by [Defendant] about possible prejudice. Tenn. R. App. 36(a)." *Coulter*, 67 S.W.3d at 52. Defendant is not entitled to relief on this issue.

### VI. *Derrick Raines' 404(b) hearing* (*Defendant's Issue VIII*).

Defendant contends that the State committed prosecutorial misconduct by

> violating pretrial Orders for pretrial hearings and rulings on Rule 404(b) and Rule 608(b)(3) and 609(a)(3) evidence; committed misconduct during the trial by the prosecutor calling and having Derrick Raines sworn in the presence of the jury requiring [Defendant] to object; and then committed misconduct by misusing a Rule 404(b) hearing as a pretext to investigate Derrick Raines to develop 404(b) and/or 608(b)(3) evidence; to telegraph to the jury that [Defendant] did not want Derrick Raines to testify to what the prosecutor wanted.

It is well-established precedent "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod,* 937 S.W.2d 867, 871 (Tenn.1996). Tenn. Rule of Evid. 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton,* 694 S.W.2d 299, 303 (Tenn.1985); *State v. Hooten,* 735 S.W.2d 823, 824 (Tenn.Crim.App.1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1)

upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

In this case, Defendant moved the trial court to make pre-trial determinations concerning the admission of any Tenn. R. Evid. 404(b) evidence, and the State agreed to Defendant's motion. During trial, the State called Derrick Raines to testify. Defendant objected, and a bench conference was held. Defense counsel argued that there was no notice from the State that Mr. Raines would be called as a witness and that no Rule 404(b) hearing had been conducted. The State pointed out that the shooting occurred on Mr. Raines' property. The State also had learned the week prior to trial that Mr. Raines and Defendant had begun dating prior to the offense in this case, they were still dating at the time of the trial, and Mr. Raines had told an officer at the crime scene that "if anything ever happened to him that [Defendant] needed to be looked at." The State had subpoenaed Mr. Raines the Friday before the start of the trial and had informed defense counsel of the subpoena. Defendant then requested a jury-out hearing to determine the admissibility of Mr. Raines' testimony.

At the jury-out hearing, Mr. Raines testified that he lived at the address where the shooting occurred, and he learned about the shooting when Jimmy Fine called him. Mr. Raines said that he began working for Mr. Fine approximately two years before trial. Defendant then objected stating that the State was investigating new evidence rather than conducting a 404(b) hearing. The State indicated that it was establishing how Mr. Raines arrived at the scene. Mr. Raines testified that he was working in Jefferson County at the time of the offense, and there were numerous people on the scene by the time that he arrived. He spoke with Deputy John Carroll but denied telling Deputy Carroll "[I]f something ever happened to [me], [Deputy Carroll] need[ed] to look at [Defendant] first."

The State then asked the trial court to advise Mr. Raines of his Fifth Amendment right against self incrimination because the State was concerned that Mr. Raines was giving perjured testimony. Mr. Raines indicated he understood that he could be charged with perjury if he testified falsely, but he maintained that he "did not say that like that" to Deputy Carroll. The State then asked for clarification about what Mr. Raines meant, and he invoked his Fifth Amendment right to remain silent. Mr. Raines also denied that he was in a romantic or sexual relationship with Defendant at the time of the offense. He said that his son lived with Defendant because Mr. Raines' house burned down. However, he denied living with Defendant. Mr. Raines admitted that he, Defendant, his child, and Defendant's child recently travelled to Michigan to attend a funeral. They all shared one hotel room but he and Defendant did not share a bed.

- 30 -

The trial court made the following findings: "Now the court will not permit this line of questioning. If there are other things that he can be called upon to testify to, that certainly will be permitted, but I will not allow you to get into character evidence." Mr. Raines was never called to testify at trial.

As pointed out by the State, Defendant has waived this issue because it was not included in her motion for new trial. Tenn. R. App. P. 3(e). Furthermore, as argued by the State the motion for new trial was limited to whether it was error for the 404(b) hearing to be conducted midtrial instead of pretrial, as was requested in Defendant's motion in limine. The State also asserts that Defendant's motion for new trial does not "contain a claim that the State improperly used the 404(b) hearing to investigate evidence that it did not already have." Defendant argues that the State misused the 404(b) hearing to investigate and interrogate Derrick Raines in the middle of the trial to attempt to obtain 404(b) or "603 evidence the prosecutor did not otherwise have."

Defendant also seems to argue that it was error for the jury to return and see an empty witness box because this "improperly telegraph[ed] to the jury that the prosecutor wanted Derrick Raines to testify for the State about something; that the defense did not want Derrick Raines to testify about that something; and that after the extended proceedings, the defense was successful in keeping from the jury the testimony of Derrick Raines the prosecutor wanted the jury to hear." As argued by the State, Defendant did not object to the jury returning to the courtroom to see an empty witness box. Therefore, this issue is waived. Tenn. R. App. P. 36(a)(failure to raise a contemporaneous objection results in waiver of the issue).

We find that Defendant has waived her issues concerning Mr. Raines' 404(b) hearing. To the extent that Defendant argues it was error for the 404(b) hearing to be conducted midtrial instead of pretrial, as was requested in Defendant's motion in limine and argued in the motion for new trial, we find that any such error was harmless and was not "prejudicial to the judicial process" as argued by Defendant in her brief. The trial court held that Mr. Raines could not testify concerning any character evidence, and Mr. Raines did not testify at all at trial. We also decline to review the issue for plain error. Defendant is not entitled to relief.

### VII. *Violation of the Right to a Public Trial (Defendant's Issue VI).*

Defendant argues that the trial court violated her right to a public trial by excluding the public and her family from two jury-out hearings that were held to determine whether certain witnesses' out-of-court communications violated Tenn. R. Evid. 615.

The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution afford an accused the right to a "public trial." *See In re*

*Oliver*, 333 U.S. 257, 68 S. Ct. 499 (1948); *State v. Schiefelbein*, 230 S.W.3d 88, 114 (Tenn. Crim. App.), *perm. to appeal denied* (Tenn. 2007); *State v. Sams*, 802 S.W.2d 635 (Tenn. Crim. App. 1990). This right is regarded as "a shared right of the accused and the public, the common concern being the assurance of fairness." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7, 106 S. Ct. 2735, 2739 (1986). "Transparency," it has been said, "is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99, 123 S. Ct. 1140, 1150 (2003). One purpose of a public trial is to allow a defendant the presence of a friend "who might give him legitimate assistance or comfort without interfering" with the proceedings. *Commonwealth v. Marshall*, 253 N.E.2d 333, 334 (Mass. 1969). The right to a public trial is not absolute, however, and in certain cases must yield to other rights or interests. *See Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 2215 (1984).

In this case, the trial transcript reflects that before a lunch break, Keith Haas, an assistant public defender, interrupted a witness's testimony to inform the trial court that he overheard Detective Oury and Lieutenant Holt discussing Lieutenant Holt's trial testimony. The trial court decided to finish with the witness who was on the stand and take up the matter after lunch. The trial court then excluded the courtroom gallery until 1:30 p.m. The trial court told those who remained that there would be a hearing at 1:30 p.m. to determine whether Tenn. R. Evid. 615 had been violated by the communication between Detective Oury and Lieutenant Holt. The trial court further instructed Lieutenant Holt, Detective Oury, and other necessary witnesses to report to court at that time.

The transcript then states, "Whereupon, the following hearing was had after lunch out of the hearing of the jury[.]" The transcript does not indicate that the public was excluded during the hearing. The only indication that the public may have had limited access to the courtroom during the hearing was that a ladder was placed in front of the door to the courtroom without the trial court's knowledge. There was nothing in the transcript to indicate that the public had to be let back into the courtroom after the jury-out hearing. Furthermore, as pointed out by the State, the trial court instructed someone in the courtroom to "sit" and the court also asked other people to step outside during Lieutenant Holt's testimony.

The transcript also reflects that the day after Derrick Raines' 404(b) hearing, the bailiff informed the trial court that he had heard Mr. Raines "talking to another boy about the case." The "boy" and Defendant went downstairs. Another bailiff then saw Mr. Raines downstairs talking to a potential defense witness. Prior to the hearing to determine whether Tenn. R. Evid. 615 had been violated by the communication between Mr. Raines and a potential defense witness, defense counsel asked, "Judge, are you going to do this as an out of hearing like we did the other person's?" The trial court responded affirmatively and instructed everyone in the audience to leave. The transcript states,

"Whereupon, the following testimony was given out of the hearing of the jury and open court[.]"

Initially we note, as it relates to Derrick Raines' Rule 615 hearing, Defendant failed to include the issue in her motion for new trial. Tenn. R. App. P. 3(e). Furthermore, Defendant did not object to the trial court's clearing of the courtroom for Mr. Raines' Tenn. R. Evid. 615 hearing nor did he object to any supposedly clearing of the courtroom for Detective Oury's and Lieutenant Holt's Rule 615 hearing. These failures normally result in waiver of the issue. *State v. Schiefelbein*, 230 S.W.3d 88, 116 (Tenn. Crim. App. 2007)("[E]ven if the right to a public trial was somehow implicated, we believe the issue was resolved by the defendant's failures to object to the trial court's actions or otherwise make known his concern."). We conclude that in this case, the issue is waived and decline to review the issue for plain error. Defendant is not entitled to relief.

*VIII.   Expert Testimony*

Defendant claims that she was subject to "expert ambush" by Dr. Mileusnic-Polchan and Agent Scott in violation of Rule 16(a)(1)(G). She contends that they testified to opinions that were not contained in their respective reports.

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-264 (Tenn. 1997). Pursuant to Rule 702 of the Tennessee Rules of Evidence, an expert may testify "in the form of an opinion or otherwise," when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Rule 703 of the Tennessee Rules of Evidence requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. *Id.* at 832.

Rule 16(a)(1)(G) entitles a defendant to reports created by expert witnesses of the State which show the results of examinations and/or experiments. Defendant asserts two separate instances of an expert's testimony falling outside of Rule 16 reports: (1) Dr. Mileusnic-Polchan's testimony and (2) TBI ballistic expert Steve Scott's (Agent Scott) performance of the pencil test. Defendant is not entitled to relief on either claim. Both experts submitted reports in compliance with Rule 16 that were accepted by Defendant, and the trial court acted appropriately within its discretion in its role as "gate-keeper."

Defendant cites the court's "gate-keeper" role pursuant to Tennessee Supreme Court cases *McDaniel* and *Davidson* and United States Supreme Court cases *Kumho Tire* and *Daubert*. *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). These cases stand for the obligation of a trial judge to ensure expert testimony is relevant and reliable, and establish trial judges as the "gate-keepers" for expert testimony to be admitted at trial. *Id.* Trial judges are not required to evaluate evidence or testimony for validity or agreement, but only a preliminary assessment to determine if the jury should be allowed to observe the evidence or testimony. *McDaniels*, 855 S.W.2d at 265. Defendant has not made claims that the experts were unqualified or testified to material not related to the case. She claims that Dr. Mileusnic-Polchan and Agent Scott testified outside their Rule 16 report, and the court violated its gate-keeping role by allowing the experts to testify outside of these reports.

As for the first claim concerning Dr. Mileusnic-Polchan's testimony, there are no grounds for relief. Defendant asserts that Dr. Mileusnic-Polchan improperly testified to information outside of her Rule(a)(1)(G) report, which did not allow for proper inspection by the defense counsel and resulted in an ambush during trial. Tenn. R. Evid. 703 provides that facts or data in a case which an expert bases an opinion on may be made known to the expert at or before the hearing. Therefore, if an expert may testify to information made known to them at trial, it logically follows that an expert may properly testify outside the exact contents of their Rule 16 report. Further, ". . . it is not the prejudice which resulted from the witnesses' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." *State v. Harris*, No. C.C.A. 88-188-III, 1989 WL 60393, at *4 (Tenn. Crim. App. June 7, 1989). Defendant was on full notice that Dr. Mileusnic-Polchan would be offering her expert testimony, and there have not been any claims that Dr. Mileusnic-Polchan testified outside her expertise and knowledge as required by Tenn. R. Evid. 702 and 703. Defendant has not met her burden of proving there was a violation of Rule 16, nor that any purported violation unduly prejudiced Defendant. Therefore, the trial court properly acted within its "gate-keeping" role.

Defendant is also not entitled to relief on her claims that Agent Scott testified outside of his Rule 16 report by performing the pencil test. Tenn. R. Evid. 702 allows experts to testify in the form of an opinion or otherwise. Expert testimony does not have to be in the form of an opinion, and can be presented in the form of a demonstration or test. *Pinchon v. Opryland USA, Inc.*, 841 S.W.2d 326 (Tenn. App. 1992). Agent Scott's demonstration of the pencil test falls within the scope of a proper expert testimony. As far as Defendant's claim that she was "ambushed" by the performance of the pencil test, the pencil test was in fact disclosed to Defendant in Agent Scott's TBI Crime Laboratory Firearms Worksheet which was admitted as an exhibit at trial. Rule 16 requires the prosecution to provide items to the defense so that they may, "inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific

tests or experiments." Tenn. R. Crim. P. 16(a)(1)(G). There is no record of objection to the Firearms Worksheet by Defendant. On this worksheet is a line which states "Checked hammer block with pencil test=Ok/ss." Defendant had notice that Agent Scott had performed the pencil test with the weapon. Defendant claims that she was ambushed by the performance of the pencil test, and had no opportunity for independent investigation or preparation for cross-examination. However, the record mentioned the pencil test, and there was sufficient notice. Therefore, there was no violation of the court's "gate-keeping" role. Defendant is not entitled to relief on this issue.

### IX.     Denial of Request for Special Jury Instruction

Defendant claims two instances of improper jury instructions: (1) the court's denial of her request to instruct the jury concerning the definition of an "accidental shooting" and (2) the court's denial of her request to instruct the jury with the statutory definitions of relevant mental states. In reference to the second instance, she further claims the court's ad hoc statements concerning the difference between second degree murder and reckless homicide were confusing and incomplete.

In order to prevail on a claim of improper jury instructions, Defendant must prove that (1) the jury instructions given were an improper and incomplete charge of the law and (2) these instructions resulted in prejudice against Defendant during trial. A defendant has a constitutional right to a full and complete charge of the law. *State v. Walker*, 29 S.W.2d 885, 893 (Tenn. Crim. App. 1999) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Trial courts have an obligation to give a full instruction concerning the charge of the offense. *Id*. Further, the trial court is not required to give a special instruction if the general jury charge is correct and complete. *State v. Zirkle*, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). A jury instruction is prejudicially erroneous "only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). Challenges to a trial court's jury instructions are mixed questions of fact and law, and therefore are reviewed de novo. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In *State v. Davis*, the trial court denied the defendant's special request for a jury instruction on accidental shooting, while informing the defendant that he was still entitled to raise an accident defense. No. W2013-01122-CCA-R3-CD, 2014 WL 1258844, at *9 (Tenn. Crim. App. Mar. 26, 2014). The court instructed the jury on second degree murder, voluntary manslaughter, reckless homicide, and negligent homicide. *Id*. This court held that the instructions were proper and complete, and that the defendant was not impeded from arguing the shooting was accidental. *Id*. at *9 (citing *State v. Yul Vance Robinette*, No. 03C01-9611-CR-00430, 1997 WL 671889 at *5 (Tenn. Crim. App., Oct. 29, 1997)). Therefore, there were no grounds for relief on the basis of improper jury instructions. *Id*. at *9.

- 35 -

First, Defendant claims the trial court's denial of her request to instruct the jury concerning the definition of an "accidental shooting" was improper and prejudicial. Similar to *Davis*, the court gave a complete and correct instruction of the law concerning the charges against Defendant. The trial court is not required to give any special instruction if the jury charge is complete. Also similar to *Davis*, Defendant was not impeded from arguing a defense of an accidental shooting. Therefore, the claim of improper jury instruction for omitting an instruction concerning the definition of "accidental shooting" is without merit, and fails to meet the first element of a claim for relief.

Second, Defendant claims the court's denial of her request for the statutory definitions of mental states, as well as the ad hoc comments made by the court, confused and mislead the jury resulting in prejudice. The trial court provided the applicable Pattern Jury Instructions on the mental states of intentional, knowingly, and recklessly to the jury and declined to submit the statutory definitions. Once again, a jury charge is erroneous only if it fails to submit the proper issues or misleads the jury. *Faulkner*, 154 S.W.3d at 58. While Pattern Jury Instructions are not entitled to any particular deference, Defendant does not raise a particular issue with the instructions themselves, but rather with the refusal to use the statutory definitions. S*tate v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). In terms of the ad hoc comments, when evaluating jury instructions, the reviewing court should view the instruction in the context of the charge as a whole. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). The ad hoc comments, which were legally correct, were made at the beginning of the trial, and followed by official instructions in line with the official definitions numerous times. Read as a whole, the jury was completely and correctly informed of the definitions of the relevant mental states. Further, as the State points out, there is no indication of juror confusion as to the mental states, as the only question the jury asked during deliberation was about how the instructions for mistake of fact and ignorance applied to reckless homicide. Defendant fails to meet the second element, that prejudice resulted from the jury instruction. Therefore, there is no basis for relief based on the second claim of improper jury instruction.

Defendant is not entitled to relief for improper jury instructions, and she is not entitled to relief on this issue.

## X. *Exposure of the Jury to Extraneous Information*

Defendant argues that the jury was improperly exposed to extraneous information because a bailiff communicated the jury's question to the trial court. She further claims that the interaction was unlawful and asks that prejudice be presumed. When bringing a claim for improper outside communication with a jury member, the complaining party has the burden of proving that there was improper outside communication. *State v.*

*Adams*, 405 S.W.3d 641, 650 (Tenn. 2013). When a jury is not sequestered, something more than a showing of an extra-judicial communication between a juror and a third party is required to shift the burden to the State. There must also be evidence that, as a result of the extra-judicial communication, some extraneous prejudicial fact or opinion "was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors." *State v. Smith*, 418 S.W.3d 38, 46 (Tenn. 2013) (citing *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984)). Once the complaining party has established the presence of extraneous prejudicial communication, the burden then shifts to the state. *Id*. In order to prevail on appeal, the complaining party showing extrajudicial communication must show plain and prejudicial error in the court below. *Adams*, 405 S.W.3d at 650.

In *State v. Bargery*, this court established four factors in determining whether the complaining party has established a rebuttable presumption of extrajudicial communication: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial. No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *83 (Tenn. Crim. App. Oct. 6, 2017) (quoting *Adams*, 405 S.W.3d at 654). These four factors are evaluated together to determine whether the extrajudicial communication was unduly prejudicial.

In this case, the record reflects that the bailiff communicated a question between the jurors concerning the mistake of fact aspect to a charge of second-degree murder and reckless homicide. The court, as a response, re-read the previously given instruction. Defendant has presented no evidence that there was any communication other than the jury telling the bailiff a question and the bailiff communicating the question to the court. This does not qualify as extrajudicial communication because there was no personal opinion or outside facts presented to the jury. The nature and content of the information given by the jury to the bailiff does not support Defendant's claim of the jury being exposed to extraneous information. Therefore, Defendant is not entitled to relief on this issue.

### XI. Improper Closing Argument

Defendant argues that the State committed prosecutorial misconduct in its closing arguments to the jury and identifies ten statements in closing which she alleges were improper.

Closing arguments are valuable tools for both the prosecution and the defense, and the Tennessee Supreme Court has historically allowed wide latitude to counsel in arguing their cases during closing arguments. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994). "Trial judges in turn are accorded wide discretion in their control of those

arguments." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. 2003) (quoting *State v. Zirkle*, 910 S.W.2d at 888). In order to properly bring an issue with closing argument forward on appeal, the complaining party must have objected to the argument contemporaneously. *State v. Robinson*, 146 S.W.3d 469, 518 (Tenn. 2004); *See State v. Green*, 947 S.W.3d 186, 188 (Tenn. Crim. App. 1997).

Further, a trial judge's discretion will not be interfered with in terms of closing arguments without evidence of abuse. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn.1975). There is a reversible error only when, "conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In *Judge v. State*, this court determined five factors to consider to determine whether there has been prosecutorial misconduct in closing arguments: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In *State v. Goltz*, the Tennessee Supreme Court outlined "five general areas of prosecutorial misconduct" that can occur during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or the defendant's guilt; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. *Goltz*, 111 S.W.3d at 5.

Defendant has specified ten separate instances of prosecutorial misconduct in line with *Goltz*: (1)Defendant claims the prosecutor violated *Goltz* factors 2, 3, and 4 by stating that Defendant "wants you to believe that she went and she grabbed him up and she held him and told him not to leave her and that he was just pray for me" was "smoke and mirrors . . . total smoke and mirrors;" (2) Defendant claims the prosecutor violated *Goltz* factors 2, 3, and 4 by stating her personal opinion that "Just with every great actor, they set a stage. That stage was set [by Defendant] long before the 911 call came in;" (3) Defendant claims the prosecutor violated *Goltz* factors 2, 3, and 4 by stating her personal opinion that "that's what she wants you to believe. That is preposterous;" (4) Defendant asserts, the prosecutor violated Defendant's constitutional right to not be required to produce evidence. Defendant bases this accusation on the prosecution's statements that, "there is no proof of that," in reference to Defendant's claim the shooting was accidental; (5) Defendant claims the prosecutor violated *Goltz* factor 1 when she stated to the jury that upon Ms. Gorrell arriving, there were three consistent statements as to what had happened. Defendant claims this was not supported by evidence; (6) Defendant claims the prosecutor violated *Goltz* factors 1, 2, 3, and 4 by stating her personal opinion that the

911 cell phone call is irrelevant because "You can't get past the fact she said she shot him. We know he's dead;" (7) Defendant claims the prosecutor violated *Goltz* factors 1 and 3 by dramatizing the "pencil" test by dictating 12 "taps" of the scissors; (8) Defendant claims the prosecutor violated *Goltz* factors 1, 2, and 3 by arguing that the fourteen-pound weight of the trigger pull was the same as a four-pound bag of sugar, a five-pound bag of potatoes, and a five-pound bag of flour in a grocery bag; (9) Defendant claims the prosecutor violated *Goltz* factors 1, 2, 3, and 4 by stating the personal opinion that "Mr. Moncier would have you believe that we have people standing on her head for six hours drilling her. That is not true," in violation of the pretrial notice and Order not to comment on the truthfulness of defense counsel; and (10) Defendant claims the prosecutor violated *Goltz* factors 1, 2, and 3 by commenting on the defense not offering evidence of the red jacket, where the proof established that it is unclear what happened to the jacket after the scene investigation by law enforcement.

As the State points out, Defendant only objected to claims 8 and 10 during closing arguments. All other claims made by Defendant were not objected to during trial nor were they included in her motion for new trial. According to the Tennessee Supreme Court's ruling in *State v. Robinson*, claims 1-7 and 9 are thereby waived. 146 S.W.3d 518. *See also State v. Hill*, 333 S.W.3d 106, 129-29 (improper closing argument claims are waived when not included in the motion for new trial); Tenn. R. App. P. 36(a).

In Claim 8, Defendant argues the prosecutor violated *Goltz* factors 1, 2, and 3 by using a grocery analogy to illustrate to the jury the weight of a trigger pull. The prosecutor stated the following in closing argument concerning this claim:

> Now, the weight. Weight is just subjective to people, five pounds, 14 pounds, you know. It's not visual, so as reference, that's a five pound bag of potatoes. Five pounds. This right here, that's a five pound bag of flour. (Indicating.) . . . This, this sugar is four pounds. Let's start with these potatoes. Five pounds. Five pounds. Let's add another five pounds. Let's add another five pounds but in a separate bag to show you. That's a separate five pounds of flour. Now, let's put all of them. That's considering that firearm was only single action, not double. We're only going by what she said that weapon was. But now, if it was double action, the whole bag of groceries. That's fourteen pounds, that. That's what she would have had to have done individually. We all go to the grocery store. That's not free weight. It's five pounds. That's what it would have taken with her holding that and pulling the trigger. She couldn't just it went off, it just went boom. No. Our expert said that was not going to happen because it was operational. Their expert told you the same thing. That was function. There was a safety block in place, that would not just discharge.

- 39 -

The gun used in this case would in fact require fourteen pounds of pressure to fire. There was no personal opinion described in this section, but rather the equating of fourteen pounds of pressure to items that an average person would be able to relate to. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999)(court evaluation of improper and inflammatory closing argument). Especially when taken in consideration with the *Judge* factors, the analogy of the pressure needed to pull the trigger to the weight of groceries does not constitute a reversible error which caused undue prejudice to the Defendant. As argued by the State, the prosecutor's comment invited the jury to use their own common sense and experience with typical grocery items to equate what five pounds and fourteen pounds would feel like to illustrate how much pressure would be required to fire the gun in either single or double-action mode. A jury is allowed to draw inferences from their own personal experiences to understand evidence presented at trial. *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013). Additionally, the prosecutor's statement was in response to Defendant's argument that the shooting was an accident because the trigger required a third of the weight to shoot if the hammer was already cocked. The prosecutor's argument was not improper.

In Claim 10, Defendant argues that by mentioning the red jacket shown in photos of the crime scene, but missing from evidence, the prosecution violated Goltz factors 1, 2, and 3. The red jacket was a highly contested item during trial, and mentioned during the Defendant's closing argument. The prosecutor made the following statement during rebuttal closing argument:

> There's all this hoopla about this jacket. She didn't give it to [Detective] Oury when he collected her personal effects. The irony of it is that when she retained Mr. Moncier, she didn't bring the jacket and give it to him to say here it is. It wasn't put out here in evidence that they had this jacket. It's just this side piece fuzzy for you to look at and focus on that as opposed . . . as opposed to focusing on the fact of what she said, that she shot her husband and how she held that gun and how her finger was in that trigger guard.

The prosecutor's comment was apparently in response to Defendant's argument that the State had to abandon its claim that Defendant should have been covered in blood once they learned that Defendant had been wearing a pink jacket that was not collected from the scene. *See State v. Payne*, No. 1168, 1988 WL 82958, at *2 (Tenn. Crim. App. Aug. 12, 1988)("[P]rosecutor's comment was excusable because it was made in response to defense counsel's argument that the state had failed to rebut the defendants' testimony."). The State's argument was not a comment on Defendant's right to present a defense but noted that Defendant continuously pointed to a pink or red piece of fabric depicted in a photograph which was lying among items outside of Mr. Raines' residence in order to raise questions about the amount of blood on Defendant's shirt. The State's argument was not improper.

- 40 -

Additionally, Defendant has not met her burden of proving that this portion of the closing argument affected the verdict to her detriment. When taking into account the *Judge* factors, specifically the cumulative effect of alleged improper conduct and the relative strength or weakness of the case, Defendant fails to establish that the mention of the red jacket affected her conviction of reckless homicide. The jury acquitted Defendant of second-degree murder and thereby of any knowing killing of the victim. Acting with the degree of recklessness to sustain a conviction of reckless homicide has nothing to do with the presence or absence of the red or pink jacket and therefore did not affect the ultimate verdict of the jury. Moreover, the proof overwhelmingly showed that Defendant acted recklessly when she shot the victim. Therefore, Defendant was not prejudiced by any alleged improper argument.

Defendant has not established improper prosecutor conduct during closing arguments for claims 8 and 10. She has also waived claims 1-7 and 9 for failing to object to the prosecutor's statements and by failing to include the claims in her motion for new trial. We decline to review those claims for plain error. Defendant is not entitled to relief.

### XII.    *Denial of Alternative Sentencing*

Defendant contends that the trial court erred by denying her alternative sentencing. Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

In *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), the supreme court expanded its holding in *Bise* to trial courts' decisions regarding alternative sentencing. Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2017).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(A). However, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-303(b). As a Range I offender convicted of a Class D felony, Defendant in this case was eligible for alternative sentencing, and she was considered a favorable candidate for alternative sentencing options. *See id.* § 40-35-102(6).

In determining the manner of service for Defendant's sentence, the trial court in this case noted that Defendant had a prior conviction for theft, and she had five prior felony convictions for forging prescriptions and was placed on supervised probation, which she violated multiple times.

The trial court considered the facts of this case and the appropriate sentencing principles. Contrary to Defendant's assertions, the trial court did not deny alternative sentencing solely because a death occurred and Defendant was convicted of reckless homicide. As stated above, Defendant had a prior conviction for theft and five prior convictions for forging a prescription, and she had previously violated the terms of her probation for those offenses by failing to report and absconding. T.C.A. § 40-35-103(1)(A) and (C). A trial court may deny alternative sentencing if it finds that any one of the factors found at T.C.A. § 40-35-103 apply. *State v. Christopher Allen*, No. W2016-00505-CCA-R3-CD, 2017 WL 764552, at *4 (Tenn. Crim. App. Feb. 24, 2017); *State v. John Anthony Garrett*, No. E2012-01898-CCA-R3-CD, 2013 WL 5373156, at *4 (Tenn. Crim. App. Sept. 23, 2013). Accordingly, the trial court did not abuse its discretion in ordering Defendant to serve her sentence in confinement.

### XIII. Cumulative Error

Defendant maintains that she is entitled to relief based on the cumulative error doctrine. Our supreme court has recognized the cumulative error doctrine as a "judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). The State maintains that Defendant waived this issue by failing to raise it in her motion for new trial. *See* Tenn. R. App. P. 3(e); *State v. Korie Bates*, No. W2004-00686-CCA-R3-CD, 2005 WL 1215963, at *8 (Tenn. Crim. App. May 20, 2005) (holding that the defendant waived his cumulative error argument by failing to raise it in his motion for new trial). Regardless, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Hester*, 324 S.W.3d at 77 (citations omitted). Having considered each of Defendant's issues on appeal and finding no error, we need not consider the cumulative effect of any alleged errors.

### CONCLUSION

Having reviewed the entire record and the parties' briefs in this case, we find no error and affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE